Brian O'Mara (Cal. Bar No. 229737)
**DICELLO LEVITT LLP**
4747 Executive Dr., Suite 240
San Diego, CA 92121
Telephone: (619) 923-3939
briano@dicellolevitt.com

Daniel R. Schwartz (pro hac vice pending)
Rebecca Trickey (pro hac vice pending)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
dschwartz@dicellolevitt.com
rtrickey@dicellolevitt.com

David A. Straite (pro hac vice pending)
**DICELLO LEVITT LLP**
485 Lexington Ave., Tenth Floor
New York, New York 10017
Telephone: (646) 933-1000
dstraite@dicellolevitt.com

*Attorneys for Plaintiff and the*
*Putative Class and Subclass*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| MINCHUL PAUL CHWE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> ADOBE INC., <br><br> Defendant. | Case No. _____ <br><br> COMPLAINT <br><br> <u>CLASS ACTION</u> <br><br> JURY TRIAL DEMANDED |

**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**
**(PROVISIONAL REDACTIONS PENDING COURT APPROVAL)**

Plaintiff Minchul Paul Chwe ("Plaintiff" or "Chwe"), individually and on behalf of the other members of the below-defined putative class and subclass he seeks to represent (the "Class"), hereby alleges as his Complaint against Defendant Adobe Inc. ("Adobe" or "Defendant"), upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by the undersigned attorneys, as follows:

## I.     NATURE OF THE CASE

1.     Adobe once proclaimed it wanted to "create the future."[1] But the future Adobe is hoping to shape is one of dystopian corporate surveillance, where consumers—even and especially those consumers with no contractual relationship to Adobe or its corporate clients—are tracked across the internet and across their devices, profiled, and used for profit, all without the consumers' knowledge.

2.     While offering services to first-party websites through a data management platform, Adobe has created, in its own words, a "real-time" means of tracking the personal information of hundreds of millions, if not billions, of people.[2] Adobe has created a comprehensive surveillance suite—its "Adobe Experience Platform"—which facilitates the collection and compilation of vast amounts of data on individual consumers who are wholly unaware of this surveillance.

3.     Adobe's platform enables its corporate clients to compile and link first- and second-party data of their individual customers and prospective customers, purchase data from third-party data brokers to augment their existing customer data, and create detailed profiles of their current customers through an "ID Graph," which merges the customers' online and offline traits and behaviors into a single comprehensive profile.

---

[1]  ADOBE, *Adobe Fast Facts*, https://www.adobe.com/about-adobe/fast-facts.html (last visited Nov. 4, 2024).

[2]  ADOBE, *Real-Time CDP*, https://business.adobe.com/products/real-time-customer-data-platform/rtcdp.html (last visited May 4, 2025).

4.      Adobe enables its corporate clients to collect and track *over 100,000* different traits for each individual consumer, meaning that profiles compiled on these individuals can be extremely detailed and, consequently, profoundly invasive.[3]

5.      Adobe also performs surveillance of its own on behalf of its corporate clients, placing third-party tracking cookies on consumers' browsers and on their mobile devices without their consent. These cookies frequently "sync" with other cookies – that is, they share the information they have gathered on consumers with other major internet companies that are also gathering data using third-party cookies in order to grow their database of information on consumers.

6.      Adobe also employs a system to disguise third-party cookies as first-party cookies by associating the cookies with the subdomains of their corporate clients. Even though these cookies serve the same function as third-party cookies – sending users' information back to Adobe – this subdomain piggybacking enables Adobe to circumvent consumers' decisions to "block" third-party cookies (such as by opting out of third-party cookies when offered the choice, or setting their device's settings to automatically block third party cookies).

7.      What is more, evidence gathered by an expert engaged by counsel for the Plaintiff suggests that Adobe may ignore user attempts to opt out of being tracked by its cookies, even when these requests are made directly through Adobe's website.

8.      Adobe has *thousands* of corporate clients, across virtually all industries, that use Adobe's surveillance suite and integrate Adobe's tracking technology with their websites. Websites featuring Adobe's tracking tools include sites as diverse as Amazon.com, LinkedIn.com,    CDC.gov,    RalphLauren.com,    CVSHealth.com,    CitizensBank.com, Onstar.com,    CNBC.com,    NorthwesternMutual.com,    CapitalOne.com,    Costco.com,

---

[3] ADOBE,    *Usage    Limits*,    https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/features/administration/usage-limits  (last accessed May 5, 2025).

1  ConsumerCellular.com, and thousands of others.[4] The magnitude of Adobe's tracking cannot

2  be overstated; it is likely that almost every internet user has encountered multiple websites

3  that acts as nodes in Adobe's enormous spying network.[5]

4          9.      The upshot is that Adobe, while insisting that it is at the forefront of consumer

5  privacy, has built a digital panopticon that deliberately spoofs first-party tracking tools to

6  sidestep meaningful consumer privacy protections and makes it trivially easy for Adobe and

7  their corporate clients to spy on millions of people, while robbing those people of a way to

8  opt out of that spying.

9          10.     Adobe then attempts to absolve itself of responsibility for any unauthorized

10 spying that its corporate clients engage in using its surveillance tools. Adobe inappropriately

11 relies on the word of those corporate clients that the representations those clients make to

12 their customers regarding the use of customer data are accurate. Adobe theoretically offers

13 corporate clients the tools to ensure that the data collection and compilation they engage in

14 using Adobe's suite of products is in-line with those clients' privacy policies, but the onus is

15 on the corporate clients themselves to actually use the compliance tools. This results in a

16 situation with profound information asymmetry; the corporate client can have full access to

17 data that it insists it does not collect from its customers in its privacy policy, and the

18 customers have no way of knowing that the corporate client does, in fact, have full access to

19 that data. And Adobe, standing on the sidelines, will merely shrug its shoulders and insist

20 that it is not responsible for corporate clients using Adobe's spying tool to spy on people,

21 simply because the corporate clients promised they weren't.

22         11.     Adobe is facilitating the unlawful surveillance of users across the internet,

23 following them from site to site without their knowledge, and profiting from that

24

25

---

26 [4]          BUILTWITH, *Websites     Using     Adobe     Analytics*,
   https://trends.builtwith.com/websitelist/Adobe-Analytics (last visited May 5, 2025)

27 [5] *See* Exhibit C (of the top 10,000 websites in the United States, Adobe tracking technology
28 is found on more than 1,300 of them).

surveillance. Their actions represent a clear violation of right to privacy guaranteed by, among other things, the California Constitution and the California Invasion of Privacy Act.

12.    Over the past several years, Plaintiff has visited popular websites while physically present in California like ███████, ██████, and ████████ with no inkling that, when he did so, Adobe was watching, collecting data on his movements across websites, and helping create profiles of him and his behavior. As detailed in the "Plaintiff's Experiences" section below and in **Exhibit A** (the Declaration of Computer Expert Richard M. Smith), on April 14, 2025, Plaintiff re-created these website visits with a computer expert who recorded the HTTP traffic associated with visits to these same websites, confirming the unlawful dataflow.

13.    Adobe has tried to argue that this arrangement is mutually beneficial to both consumers like Plaintiff and Adobe's corporate clients. By Adobe's telling, the consumers— even if they have no idea they are being tracked across the internet and profiled—receive "personalized content, discounted product offers, and streamlined user experiences," and the corporate clients receive "vital revenue streams supporting multiple online business models."[6] But even if this is true, Adobe does not give consumers a meaningful opportunity to choose whether or not they want to accept the benefits of this "bargain."

14.    Indeed, while Adobe enables consumers to submit requests to opt out of having their data collected by Adobe, such a mechanism is only useful when those consumers are *actually aware* that their data is being collected and compiled by Adobe. Moreover, at least one of the tracking cookies employed by Adobe appears to outright ignore users' requests to not be tracked, in flagrant violation of the users' privacy.

15.    Plaintiff brings this action to reaffirm and enforce his fundamental right to privacy, which has been infringed by Adobe's wanton spying.

---

[6]    ADOBE, *Audience Manager Data Privacy Overview*, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/data-privacy/data-privacy (last visited May 5, 2025).

## II.    JURISDICTION AND VENUE

16.    This Court has original jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as it arises under the laws of the United States. The Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some members of the proposed Class are citizens of a state different from Defendant.

17.    This Court has personal jurisdiction over Defendant because Defendant conducts substantial business within this District and throughout the State of California, and is headquartered in San Jose, California.

18.    Venue properly lies with this Court pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), because Adobe maintains substantial business operations in this District, and because a substantial part of the vents or omissions giving rise to the claims described herein occurred in this District.

## III.    PARTIES

19.    Plaintiff Minchul Paul Chwe is a resident of New York County, New York. From 2020 until late August 2024, he was a resident of Los Angeles County, California.

20.    While in the State of California, and since leaving California, Plaintiff frequently visited websites with Adobe tracking technology, including ███████, ███████, and ███████, all of which integrate Adobe's tracking tools.

21.    Defendant Adobe is a Delaware corporation with its headquarters and principal place of business at 345 Park Avenue, San Jose, California 95110. Adobe engages in the business of selling consumer software and digital marketing services to individuals and businesses throughout the world, including in the State of California.

## IV.    FACTUAL ALLEGATIONS

### A.    The Adobe Experience Platform (AEP)

22.    Most people know Adobe as a consumer software company, selling industry-leading creative products like Adobe Photoshop. However, Adobe is also one of the world's

largest data compilers and digital marketers. While its profits from its data warehousing and marketing business have not been disclosed, Adobe's market cap has recently exceeded $162 billion, making it one of the most valuable companies in the world.[7]

23.     To create its robust digital marketing presence, Adobe violates the privacy of nearly every single person who uses the internet. It does so largely through its Adobe Experience Platform ("AEP"), a collection of digital marketing tools that Adobe uses to help businesses create customer profiles and leverage those profiles to efficiently target customers and prospective customers with advertisements. Adobe's corporate clients that use the AEP include major brands like Coca-Cola,[8] Hanes,[9] and The Home Depot.[10]

24.     At bottom, Adobe collects and processes data, tracking users across the internet by automatically placing so-called "cookies"—small text files—on their browsers and devices, and using the information gleaned from users' browsing data to make profiles of those users, often, as detailed in this Complaint, in flagrant violation of the users' privacy. Even where Adobe is not itself partaking in the surveillance, the AEP enables Adobe's corporate clients – the businesses paying for the AEP service – to bolster their own surveillance efforts. At all times, Adobe violates user privacy by (a) tracking users across the internet, (b) enabling others to track users across the internet and in the non-digital world, and (c) using the vast amounts of data compiled on those users on the AEP to create detailed user profiles that are leveraged to sell advertisements.

---

[7] FORBES, *Adobe*, https://www.forbes.com/companies/adobe/ (last visited May 5, 2025).

[8] ADOBE, *Coca-Cola: Refreshing experiences on a global scale*, https://business.adobe.com/customer-success-stories/coca-cola-case-study-personalization.html (last visited March 9, 2025).

[9] ADOBE, *Hanes Brands Inc: Fashioning personalized experiences for the future of retail*, https://business.adobe.com/customer-success-stories/hanesbrands-case-study.html    (last visited March 9, 2025).

[10] ADOBE, *The Home Depot: In store. Online. The Home Depot inspires the entire experience.*, https://business.adobe.com/customer-success-stories/the-home-depot-case-study.html (last visited March 9, 2025).

25.     Adobe violates user privacy through a suite of various nested Adobe products and services, as well as internal functionalities, all of which work together as part of its integrated data collection business: (a) a data management platform ("DMP") called Adobe Audience Manager ("Audience Manager"), (b) the Adobe Real-Time Customer Data Platform ("CDP") and associated identity graph ("ID Graph"), (c) Adobe's use of "cookie placement," and in particular the placement of the "AMCV cookie," "demdex cookie," and "everesttech cookie," and (d) the integration of third-party data sets from data brokers, which can be purchased on the Adobe Audience Marketplace.

26.     Adobe uses these tools in tandem to facilitate the tracking of users across the internet and stitch together detailed profiles of those users. It sells these tools, enabling its many corporate clients to have easy, virtually unchecked access to the personal information of hundreds of millions of people—even where the profiled individuals lack any direct personal relationship with Adobe or the corporate client in question.

**The Data Management Platform: Adobe Audience Manager**

27.     The Audience Manager is Adobe's data management platform, or "DMP." As the name suggests, a DMP is a software platform that enables its users – in this case, Adobe's corporate clients – to easily collect, process, and compile vast amounts of data from individuals browsing the internet and patronizing the user's brick-and-mortar locations.

28.     The data collected and compiled reflect "traits" of the individuals profiled. These traits can be demographic in nature (e.g. age, gender, shoe size, etc.) or behavioral (e.g. clicked on a certain website link). The default limit on the number of traits that a corporate client can track in Audience Manager is 100,000, enough to paint a microscopically detailed portrait of a given individual, but Adobe allows corporate clients to track even more traits on request.[11]

---

[11]     ADOBE, *Usage Limits*, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/features/administration/usage-limits (last accessed May 5, 2025).

29.    At its core, the Audience Manager is a business-facing product that helps business in their advertising endeavors, chiefly by building "audience profiles"—detailed descriptions of a business's customers and prospective customers—and breaking those customers into "segments" that share key traits and that are predicted to behave in certain ways due to those traits.[12] Adobe summarizes Audience Manager as follows:

> Audience Manager helps you bring your audience data assets together, making it easy to **collect commercially relevant information about site visitors, create marketable segments, and serve targeted advertising and content** to the right audience. Furthermore, Audience Manager offers easy tag deployment and management with robust data collection, control, and protection.
>
> With Audience Manager, you are not tied to a data seller, exchange, or demand-side platform. Additionally, Audience Manager is **completely agnostic** when it comes to our partners' data assets. With access to multiple data sources, Audience Manager **offers digital publishers the ability to use a wide variety of third-party data**.[13]

30.    In other words, Audience Manager functions no matter what data a business using it has—it is "agnostic when it comes to…partners' data," because Audience Manager has access to a pool of its own data sets – the "third-party" data described below – that it can utilize to create customer profiles for its clients and supplement any data that the corporate client already has on its customers and prospective customers.

31.    As Adobe puts it, "the right DMP will merge all your data sources together including first-party data from point-of-sale, CRM, web, and email, while allowing you to bring in second-party partner data and third-party purchased data to create a 360-degree view of your customers."[14] In other words, "the right" DMP offering will enable the DMP's user

---

[12]        ADOBE,            *Audience            Manager            Overview*, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/aam-overview (last visited March 9, 2025).

[13] *Id.* (emphases added).

[14] ADOBE, *Data Management Platform*, https://business.adobe.com/products/audience-manager/data-management-platform.html (last visited May 5, 2025).

1    to centralize all of the data that the user has already collected about its customers and then

2    further merge that data with the data compiled by second-parties (partners of the DMP user)

3    and third-parties (data brokers) regarding those same customers, creating an omnibus profile

4    on those customers that is far more comprehensive than anything the DMP user could have

5    compiled on their own just using their own "in-house" data. It also enables the DMP user to

6    generate profiles of prospective customers – individuals who do not have a relationship with

7    the DMP user – by using second- and third-party data.

8        32.    The Audience Manager should be understood, then, as a kind of hub: a

9    repository of raw data where different tools provided by Adobe can come together to aid a

10    business in its marketing campaigns to individual customers.

11        33.    Notably, Adobe has gone to great lengths to protect the data of its *corporate*

12    clients using Audience Manager. Adobe partitions Audience Manager client data so that it

13    cannot be viewed or utilized by another Audience Manager client – Coca-Cola cannot access

14    Home Depot's first-party data without Home Depot's permission – but does not extend

15    similar protections to the everyday consumers who visit corporate client websites.[15] Adobe

16    ostensibly promises to protect customer's personally identifiable information ("PII") by

17    prohibiting Audience Manager clients and data partners from sending PII data into the

18    Audience Manager,[16] but this protection is illusory at best. It has long been established that

19    deidentified data (i.e. data that has been stripped of PII) can easily be reidentified by cross-

20    referencing the deidentified data with a data set that hasn't been stripped of PII, which the

21    user could acquire through a data broker.[17] Thus, Adobe's supposed protection of PII can

---

[15]    ADOBE, *Data Security in Audience Manager*, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/data-security (last accessed May 5, 2025).

[16] *Id.*

[17] *See, e.g.,* Boris Lubarsky, *Re-Identification of "Anonymized" Data*, 1 Geo. L. Tech. Rev. 202 (2017).

1   easily be circumvented by a motivated user, and corporate profits are undoubtedly a strong

2   motivator.

3           34.     Further, while Adobe theoretically enables its corporate clients to customize

4   the settings of their version of Audience Manager to ensure that the clients are complying

5   with their stated privacy policies, Adobe does not automatically set the privacy settings for

6   a corporate client to reflect those privacy policies, and leaves it to the corporate clients to do

7   so. For example, Adobe gives corporate clients the option to obfuscate collected IP addresses,

8   but this feature must actually be enabled by the corporate client in order to be operative.[18]

9   Thus, even if the corporate clients' published privacy policy expressly states that it will only

10  collect customer's IP addresses in obfuscated form, the default settings in Audience Manager

11  will cause it to collect and compile IP addresses in full, obfuscated form. Consequently,

12  Adobe may be facilitating material misrepresentations to the corporate client's users about

13  what data is being collected and compiled using Adobe's extremely powerful platform.

14  **The Identity Service, Real-Time CDP, and the Creation of an Identity Graph**

15          35.     Adobe has created multiple products that it sells to businesses that are

16  designed to create robust profiles of those businesses' individual customers, even where, to

17  do so, Adobe is using purportedly-anonymous data.

18          36.     One core function of the AEP is what Adobe has dubbed the

19  "Adobe Experience Platform Identity Service" (or "Identity Service"). Adobe explains the

20  Identity Service as follows:

> In order to deliver relevant digital experiences, you need a comprehensive and
> accurate representation of the real-world entities that make up your customer
> base.
>
> Organizations and businesses today face a large volume of disparate datasets:
> your individual customers are represented by a variety of different identifiers.
> Your customer can be linked to different web browsers (Safari, Google
> Chrome), hardware devices (Phones, Laptops), and other person identifiers
> (CRMIDs, Email accounts). This creates a disjointed view of your customer.

---

[18] ADOBE, *IP Address Obfuscation*, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/features/administration/ip-obfuscation (last visited May 5, 2025).

You can solve these challenges with Adobe Experience Platform Identity Service and its capabilities to:

- Generate an **identity graph that links disparate identities together**, thus giving you with a visual representation of how a customer interacts with your brand across different channels.

- Create a graph for Real-Time Customer Profile, which is then used to create a comprehensive view of the customer by merging attributes and behaviors.[19]

37. In other words, Adobe acknowledges that individuals now conduct their digital lives across multiple devices and multiple accounts, and sometimes have both digital and in-person interactions with the businesses that they patronize. For example, a customer may shop in-person at Business A's brick-and-mortar store, but they might also browse Business A's catalog on their computer's web browser and keep track of their reward points in Business A's loyalty program on Business A's mobile app. The Identity Service will stitch together these different interactions and capture that they originated from the same individual, allowing Business A to see a complete picture of the customer's interactions with it. The resulting picture is the "ID Graph," which consolidates the different devices, accounts, and in-person identifiers (e.g. credit cards used) into a single graph, illustrating that those devices, accounts, and identifiers should all be understood as belonging to the same person. The ID Graph, in turn, is a key component of Adobe's Real-Time Customer Data Platform ("CDP").

38. The CDP is similar to the DMP in that it acts as a repository for information, but is in a sense more targeted because it focuses on the identities and behaviors of customers only, not on a broad population of customers, prospective customers, and other individuals whose data is acquired through a third-party data broker. Where the DMP is concerned with identifying general trends and segmenting populations with certain traits for potential directed advertising, the CDP is concerned with creating the most comprehensive profile

---

[19] ADOBE, *Adobe Experience Platform Identity Service*, https://experienceleague.adobe.com/en/docs/experience-platform/identity/home (last visited May 5, 2025) (emphasis added).

1  possible of a business's customers, watching their every move with near up-to-the-minute

2  precision.

3      39.    In order to do so, the CDP takes the ID Graph that was previously compiled

4  by the Identity Service and then creates a "merge profile" that compiles all of the traits

5  measured by the different identities in the ID Graph into a single location. Adobe itself

6  illustrates this process in Figure 1.[20]



Figure 1

19     40.    By linking all of the disparate "identities" of any one customer and enabling

20  near-real-time collection of granular information on that customer, the CDP provides

21  Adobe's corporate clients with a steady stream of information on individual customers akin

22  to a CCTV link with that customer's devices when they are engaging with the corporate

23  client.

24     41.    Even if customers anticipate that their interactions with a business they

25  choose to patronize are fair game for collection and analysis by those businesses, even at the

26  _____

27  [20] ADOBE, *Understanding the relationship between Identity Service and Real-Time Customer Profile*,  https://experienceleague.adobe.com/en/docs/experience-platform/identity/identity-and-profile (last accessed March 9, 2025).

1   microscopic level, what they might not anticipate is that those same businesses might get an

2   equally clear view **into their interactions with completely different businesses**; Adobe

3   encourages CDP customers to "enrich" their already highly-detailed customer merge profiles

4   with "external data"  and "supplement" their CDP data with partner data.[21] Indeed, Adobe

5   brags that it can help businesses "[i]dentify unknown" visitors because "Real-Time CDP lets

6   you **leverage your data partners and their recognition services** to help identify visitors

7   and link them to their known behavioral data."[22] Far from a tool allowing companies to

8   service their own clients, Adobe works to allow a company using its service to identify *any*

9   visitor: it can do so, because Adobe is tracking and profiling nearly every user on the internet.

10  **Adobe's Cookie and Tracking Pixel Placement**

11       42.    In its corporate client-facing materials, Adobe states that it is leading the way

12  into "a third-party cookieless tomorrow."[23] However, Adobe is itself a vociferous user of its

13  own third-party cookies and related tracking pixels: the 'demdex' tracking cookie ("demdex

14  cookie"),[24] the 'dextp' synchronization cookie ("dextp cookie"),[25] the "AMCV cookie,"

15  which stores the unique visitor ids that are collected by virtue of new website visits,[26] and

16  "everesttech cookie," which stores the unique visitor ids that are collected by virtue of ad

17

18

---

19  [21] ADOBE, *Adobe Real-Time CDP Features*, https://business.adobe.com/products/real-time-

20  customer-data-platform/features.html (last visited May 5, 2025).

21  [22] ADOBE, *Convert your unknown prospects*, https://business.adobe.com/products/real-time-customer-data-platform/convert-unknown-prospects.html (last visited May 4, 2025).

22  [23] ADOBE, *Adobe Audience Manager – Data management is changing. It's just the way the

23  cookie crumbles.*, https://business.adobe.com/products/audience-manager/adobe-audience-manager.html (last visited May 5, 2025)

24  [24] ADOBE, *Cookies and the Experience Cloud Identity Service*,

25  https://experienceleague.adobe.com/en/docs/id-service/using/intro/cookies (last visited March 9, 2025).

26  [25] *Id.*

27  [26] *Id.*

28

1  clicks and subsequent event clicks on a website.[27]  These cookies, working in tandem, are

2  the beating heart of Adobe's spying apparatus.

3        43.    When corporate clients use Adobe's Audience Manager, they are able to

4  integrate the demdex cookie onto their webpages. The demdex cookie is placed by Adobe

5  servers operating on the "demdex.net" domain, which was acquired by Adobe in 2011.[28]

6        44.    Once integrated, the demdex cookie will attach to the web browsers of visitors

7  to the webpage and then track those visitors' movements across the internet, including their

8  interactions with different websites. Upon information and belief, the demdex cookie enables

9  Adobe to then receive and subsequently store this information.

10        45.    The demdex cookie also syncs its cookie id with third-party data brokers and

11  advertising and technology entities. These include, but are not limited to, the following third-

12  party data brokers/advertising technology entities:

13              (a)     TransUnion;

14              (b)     LiveRamp;

15              (c)     Magnite;

16              (d)     Oracle AddThis (no longer operational);

17              (e)     Google DoubleClick;

18              (f)     Microsoft Bing;

19              (g)     Acuity Ads;

20              (h)     Pro-market.net;

21              (i)     OwnerIQ; and

22              (j)     Lotame.

23

24

---

25  [27] ADOBE, *Adobe Advertising cookies*, https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/advertising (last accessed March 9, 2025).

26

27  [28] Leena Rao, *Adobe Buys Behavioral Data Management Platform DemDex*, TECHCRUNCH, https://techcrunch.com/2011/01/18/adobe-buys-behavioral-data-management-platform-demdex/ (January 18, 2011).

28

46.     A more complete list of third-party data brokers and advertising entities that an investigation revealed Adobe syncs the demdex cookie with is attached hereto as **Exhibit B**.

47.     Cookie syncing is typically used to allow two internet ad companies to exchange data server-to-server about a person based on shared cookie ids. This shows that, beyond collecting information on behalf of its corporate clients, Adobe is also swapping that data with third-parties.

48.     In tests, Plaintiff's expert Richard Smith (see generally Exhibit A) also found that the demdex cookie id was sent to the following companies in tracking pixels:

        (a)     Flashtalking;

        (b)     Tapad; and

        (c)     LiveRamp.

49.     It is functionally impossible for the average internet user to avoid an encounter with Adobe's demdex cookie; the cookie is present on thousands upon thousands of websites including more than 1,300 of the top 10,000 most visited ones, including Amazon.com and LinkedIn.com. *See* **Exhibit C**.

50.     Moreover, Adobe is not transparent about exactly what data the demdex cookie collects and how it uses the information once compiled, stating that "Audience Manager sets this cookie to assign a unique ID to a site-visitor. The demdex cookie helps Audience Manger[sic] perform basic functions, such as visitor identification, ID synchronization, segmentation, modeling, reporting, and so on."[29] While it is unclear how exactly the demdex cookie assists with "segmentation, modeling, reporting, and so on," it would be nonsensical to deploy a tracking cookie on the scale of the demdex cookie if doing so was not profitable or otherwise crucial to Adobe's advertising business, and Adobe's lack

---

[29] ADOBE, *Audience Manager Cookies*, https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager (last visited May 5, 2025).

of transparency on this matter makes it difficult for consumers to discern exactly which personal information of theirs is being exploited by Adobe for profit.

51.     Plaintiff's expert confirmed in live testing that Adobe's cookies were collecting numerous points of data that could reveal highly sensitive information about a user, like (a) when a user added items to their online shopping cart, (b) the titles of the video content a user streamed on a popular streaming website, and (c) the titles of news articles that a user clicked on.

52.     Without expert assistance, average consumers could not possibly be aware that Adobe begins collecting their information when they visit websites featuring Adobe's cookies and that it subsequently follows them across the internet. Even if the consumer monitors their web browser to evaluate which cookies are tracking them, the demdex cookie will reflect that it originates from the demdex.net domain, with no indication that the cookie in fact belongs to tech giant Adobe. Such consumers are even less likely to know that a cookie listed as a first-party cookie on a non-Adobe website belongs to Adobe, because it would be illogical for a "first-party" cookie to belong to a third-party, but, as described more fully below, Adobe does precisely this with some of its cookies.

53.     To illustrate, see Figure 2 below. Figure 2 is a list of cookies on the Coca-Cola.com website, as they appear in the cookie opt out popup that comes up when a user navigates to Coca-Cola.com. Note that these cookies are listed based upon the domain that they are hosted on, and the major internet companies generally host these cookies on their easily-recognizable domains. It is clear that cookies from the "TikTok.com" domain are owned by TikTok, the "Google.com" domain are owned by Google, and so on. There is no listing for Adobe.com here, despite the fact that Adobe controls *three* of the domains with cookies – dpm.demdex.com, demdex.net, and everesttech.net.

**Figure 2**

54.     The demdex cookie is also particularly nefarious because it circumvents many of the anti-cookie protections that have been put in place for the benefit of consumers who do not want to be followed across the internet. When internet users navigate to a website, they are often met with a cookie consent popup that asks whether they consent to the placement of non-essential cookies (including third-party cookies). Even if the user indicates

1   that they do not consent to the placement of non-essential cookies, this decision has *no effect*

2   *whatsoever* on the demdex cookie. Plaintiff's expert found that the demdex cookie is placed

3   on the user's device near-instantaneously – within milliseconds – when they navigate to a

4   website, before any consent is solicited by the website itself. Consequently, the cookies are

5   already placed by the time the consent popup appears – i.e., a message asking whether a

6   consumer would like to opt out of third party cookies – and indicating that the user does not

7   consent to the placement of non-essential cookies will not affirmatively remove cookies that

8   have *already been placed* like the demdex cookie. Thus, the mechanism by which the

9   demdex cookie is placed is designed to lull users into a false sense of security and convince

10  them that they are not being followed.

11       55.    What is more, Adobe offers what it calls "CNAME implementations" that

12  customize the collection domain used by Adobe cookies so that they match the corporate

13  client's domain, creating a so-called "first-party collection domain."[30] This means that even

14  though Adobe's cookie is fundamentally still a third-party cookie sending information back

15  to Adobe, *it can pass itself off as a first-party cookie*, which allows it to circumvent cookie

16  blockers that are designed to stop third-party trackers like Adobe's cookies. These third-party

17  cookie blockers are essential tools that help consumers ensure that, to the extent that they are

18  in privity with a corporation and accept that by visiting that corporation's website they are

19  accepting certain conditions (such as giving the corporation access to their browser via first-

20  party cookies), they are still able to protect themselves from undesired data collection by

21  third-parties through third-party cookies. Adobe's spoofing of first-party cookies prevents

22  consumers from being able to use these essential and widely utilized privacy tools.

23

24

25

26

---

[30]        ADOBE,    *CNAME    implementation    overview*,
27  https://experienceleague.adobe.com/en/docs/id-service/using/reference/analytics-
reference/cname (last accessed March 9, 2025).

28

1    56.    Adobe even **brags** about this, admitting that "using CNAME can prevent

2  your data collection from being disrupted for users employing these tools."[31]

3    57.    It is evident that Adobe's corporate clients have made use of the "CNAME

4  implementations" feature to allow Adobe to pass off its third-party cookies as first-party

5  cookies on the clients' websites. For example, while the demdex and everesttech cookies are

6  listed as third-party cookies on Coca-Cola's website, two AMCV cookies are listed as first-

7  party coca-cola.com cookies, despite being Adobe cookies that send information back to

8  Adobe. Adobe is therefore deliberately designing its tracker features so that they can sidestep

9  protective measures put in place by users that do not want to be tracked in this manner.

10    58.    Another third-party cookie employed by Adobe is the dextp cookie, which is

11  a synchronizing cookie that facilitates the synchronization of the demdex cookie. The

12  purpose of the dextp cookie is to check to see when the last time Audience Manager made a

13  data synchronization call to each of its many Adtech partners.[32] Cookie synchronization,

14  facilitated by data synchronization calls, is a process that allows owners of third-party

15  cookies to synchronize their own data with data collected by other third-party cookie owners.

16  This means that the third-party cookie owners can exponentially increase the amount of data

17  they have access to across the internet by pulling in data from websites untouched by their

18  own cookies. Tracking cookies on their own provide tremendous amounts of information

19  about individuals' behavior on the internet, and cookie synchronization radically increases

20  that pool of information.

21    59.    Adobe has also embedded tracking technologies into mobile applications for

22  iPhones, Android phones, iPads, and Android tablets. Adobe tracking pixels can be found on

23  the following mobile applications:

24        (a)    For iOS:

25            (i)    Bank of America Online Banking;

---

[31] *Id.*

[32] *Id.*

1                (ii)      JetBlue;

2                (iii)     Amtrak;

3                (iv)     Southwest Airlines;

4                (v)      American Airlines;

5                (vi)     Delta Airlines;

6                (vii)    Marriott; and

7                (viii)   Hilton.

8         (b)     For Android:

9                (i)      Barclays US;

10              (ii)      CNN;

11              (iii)     CVS;

12              (iv)     Hilton Honors;

13              (v)      Hulu;

14              (vi)     JetBlue;

15              (vii)    Orbitz; and

16              (viii)   Walgreens.

17     60.    Plaintiff's expert also found evidence that these mobile application Adobe trackers are also being used to absorb sensitive information about users (see Exhibit A) who are completely unaware of Adobe's presence in the applications.

61.    Upon information and belief, these mobile application Adobe trackers also have built-in functionality that enables them to circumvent efforts by privacy-minded users to block the third-party collection of their data.

**The Audience Marketplace**

62.    The final key component of the AEP is the so-called "Audience Marketplace," which serves as a hub where Audience Manager users can purchase vast amounts of data

from third-party data brokers, including major data brokers like Acxiom, Experian, and Epsilon.[33]

63.    The Audience Marketplace enables Adobe's corporate clients to easily fill holes in their collected and compiled data. Because Audience Manager, on one hand, helps the corporate clients map out the data that they already have and sort the individuals profiled in their data into segments, Audience Marketplace, on the other, can evaluate that data and those segments and enable the corporate clients to efficiently purchase data on the basis of similarity to the data they have already collected and shown an interest in.[34] Functionally, this allows corporate clients to micro-target their own data acquisition and grow their massive database of knowledge on current and prospective customers, allowing them to leverage ill-gotten data to target and exploit innocent consumers on the internet.

**B.    Opting Out of Data Collection by Adobe and Its Corporate Clients**

64.    Consumers who are followed across the internet by Adobe and corporate clients enabled by Adobe are given no real say in the matter.

65.    As an initial matter, the tracking is essentially secret. The cookies are strategically named to disguise Adobe's involvement, and they are designed to get around conventional blockers of third party cookies: third-party cookie blockers are ineffective at blocking any Adobe third-party cookies that use their corporate client's domains to spoof a first-party cookie. Moreover, deleting the cookies offers only a temporary reprieve; the next time the user visits a website with the demdex cookie, it will simply be placed on that user's device again (and again, placed before a user would even have the chance to opt out).

---

[33] ADOBE, *Adobe Audience Finder*, https://www.adobe-audience-finder.com/ (last visited May 5, 2025).

[34] ADOBE, *Audience    Marketplace    for    Data    Buyers*, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/features/audience-marketplace/audience-marketplace-for-data-buyers/marketplace-data-buyers (last visited May 5, 2025).

66.    Even a user specifically desiring to rid himself of Adobe's tracking would find it incredibly difficult to do so, as the formal solution to this problem offered by Adobe is convoluted at best. As an initial matter, and somewhat counterintuitively, a user impacted by an Adobe third-party cookie must set their browser to *accept* third-party cookies in order to opt out of Adobe's cookies.[35] This is because the way that Adobe tracks which users have opted out of its cookies is through an attribute embedded in the cookies themselves.[36] As such, a user will be obligated to opt out again if at any time they (a) delete cookies, (b) change browsers, or (c) change devices.

67.    A person could navigate to Adobe itself and press an "opt out" button. But pressing the "opt out" button on the Adobe website is ineffective and may not actually prevent further tracking; Plaintiff's expert was able to demonstrate that in at least one instance, even after attempting to opt out through this method, the dpm cookie, which should theoretically be altered by the opt out to reflect that the user has opted out of collection by Adobe, continued to show the same value as the original demdex cookie prior to the opt out and the cookies continued to cookie sync. In other words, attempting to opt out through the Adobe website was completely ineffectual in stopping third-party cookie tracking and cookie syncing by Adobe.

68.    In addition to requiring a user to remember to opt out again *every single time* they clear their cookies (which consumers often do to avoid the precise type of data collection that opting out is ostensibly supposed prevent) or use a new computer or web browser, assuming that such opting out is even effective (which evidence suggests it is not), Adobe's cookie opt out mechanism does little to address the exceedingly large amounts of data that

---

[35] ADOBE, *Adobe Experience Cloud Privacy*, https://www.adobe.com/privacy/experience-cloud.html (last visited May 5, 2025).

[36] ADOBE, *Audience Manager Cookies*, https://experienceleague.adobe.com/en/docs/core-services/interface/data-collection/cookies/audience-manager (last visited May 5, 2025).

1  the demdex cookie can collect in even a short period of time, particularly if it is synched with

2  another third-party cookie.

3       69.    Indeed, the default position of Adobe is that requests to stop collecting data

4  are requests to stop collecting *further* data, and that all data collected up to that point is still

5  retained by Adobe and its corporate clients.

6       70.    For example, the Audience Manager allows corporate clients to include a

7  plug-in on their websites where users of those websites can opt in and out of collection of

8  certain specific types of information, as illustrated in Figure 3.[37]

**Figure 3**

---

[37] ADOBE, *Audience Manager Plug-in for IAB TCF*, https://experienceleague.adobe.com/en/docs/audience-manager/user-guide/overview/data-privacy/consent-management/aam-iab-plugin (last visited May 5, 2025).

71.     Adobe notes, however, that if a user of the website opts out of data collection in the above example, it "does not store any **new** user data" and "[o]pts out the user from **further** data collection."[38] This is confusing to the user and is not necessarily communicated on the corporate clients' website. For the user to fully grasp that opting out using the above list does **not** delete data already collected by the website and stored by Adobe, either (a) the corporate client would have to voluntarily disclose that information or (b) the user would have to know (1) that the corporate client was an Adobe AEP customer, (2) that Adobe was collecting information about them by virtue of its relationship with the corporate client, and (3) that details on the impact of their opt out would be available on the Adobe website, not in any of Adobe's posted privacy policies but, rather, on a highly technical page entitled "Audience Manager Plug-in for IAB TCF," which is nested in the "Audience Manager" documentation on Adobe's website.[39] This is simply not meaningful, appropriate disclosure to consumers about the extent of Adobe's data collection practices and consumers' ability to opt out of that collection.

72.     Adobe also theoretically enables users to request the deletion of their data from the AEP, but the ability of users to even make these requests is predicated on the users being aware that Adobe or their corporate client possesses their data, which might be functionally impossible if the user has no relationship whatsoever to Adobe or the corporate client or if their data was acquired through a third-party data broker.

## V.     PLAINTIFF EXPERIENCES

73.     Plaintiff is a 45-year-old professional opera singer, who typically employs Google's Chrome internet browser when browsing the internet. For the four years prior to August 2024, Mr. Chwe had been a resident of Los Angeles. In August 2024, he moved with his family to Queens, New York, where he still resides. Both during his time as a California resident, and through to the present, his browsing habits have remained consistent. When

---

[38] *Id*. (emphasis added).

[39] *Id.*

prompted by websites, his default practice is to opt out of third-party cookie collection. Typical websites he visited while living both in California and since while living in New York include, but are not limited to, websites for the provider of his most-used credit card, ███, for information about various sports teams he follows (including ███ and sites affiliated with ████████████), and for the airline he typically uses in order to travel to his opera engagements, ███.

74.    On April 14, 2025, at the direction of Plaintiff's expert Richard M. Smith, Plaintiff visited websites that he commonly visits (and commonly visited while physically present in the State of California), including the ███, ███ and ███ websites.

75.    Without Plaintiff's knowledge or consent, Adobe's tracking technology caused his browser to send detailed information regarding the content of his communications with the ███ website, revealing personal tastes and preferences. The details of the content unlawfully collected by Adobe are provided in Exhibit A, paragraph 26.

76.    Without Plaintiff's knowledge or consent, Adobe's tracking technology caused his browser to send detailed information regarding the content of his communications with the ███ website, revealing even his customer ID. The details of the content unlawfully collected by Adobe are provided in Exhibit A, paragraph 26.

77.    Without Plaintiff's knowledge or consent, Adobe's tracking technology caused his browser to send detailed information regarding the content of his communications with the ███ website, revealing even his exact airports of departure and arrival, preferred cabin, and dates of travel. The details of the content unlawfully collected by Adobe are provided in Exhibit A, paragraph 26.

78.    Had Plaintiff known that Adobe was gathering information about his activities on these websites in ways that circumvented cookie blockers, and/or creating profiles of him by surreptitiously tracking his activity across the internet, he would have demanded payment.

## VI.    CLASS ALLEGATIONS

79.    Plaintiff brings this action on behalf of himself and on behalf of all natural persons and corporations similarly situated, referred to throughout this complaint as "Class members," pursuant to Rules 23(a), 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

80.    Plaintiff brings this action on behalf of himself and other similarly situated individuals, as defined as follows:

> **Nationwide Class**: United States citizens who, during the class period, had their information collected and compiled by Adobe through its "Adobe Experience Platform" and/or through the various tracking technologies Adobe placed throughout the web.

> **California Class**: All California residents who, during the class period, had their information collected and compiled by Adobe through its "Adobe Experience Platform" and/or through the various tracking technologies Adobe placed throughout the web.

81.    Excluded from the Classes are the Defendant and any of the Defendant's members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; the judicial officers, and their immediate family members; and Court staff assigned to this case. Plaintiff reserves the right to modify or amend the Class definitions, including through the creation of sub-classes, as appropriate, during the course of this litigation.

82.    This action has been brought and may properly be maintained on behalf of the Class(es) proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

83.    Certification of Plaintiff's claims for classwide treatment is appropriate because Plaintiff can prove the elements of his claims using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

84.    **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** The members of the Class(es) are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. Plaintiff is informed and believes that there are tens of thousands, if not hundreds of thousands, of Class members in each class. While the precise

1    number of Class members is presently unknown to Plaintiff, evidence collected by Plaintiff

2    suggests that Adobe has tracking technologies embedded in hundreds of the world's most

3    visited websites, and it is likely that the ubiquity of its tracking technologies on the internet

4    means that virtually every internet user has had information collected and compiled by

5    Adobe. The individuals injured by Adobe's conduct may be ascertained from Adobe's books

6    and records.

7         85.    **Commonality and Predominance – Federal Rules of Civil Procedure**

8    **23(a)(2) and 23(b)(3).** Adobe has acted in a manner generally applicable to Plaintiff and

9    each of the other Class members. There is a well-defined community of interest in the

10   questions of law and fact involved, in that Plaintiff and other Class members' personal

11   information was similarly collected and warehoused by Adobe through the surveillance suite

12   it offers its corporate clients. The common issues arising from Adobe's conduct affecting

13   Class members, as described *supra*, predominate over any individualized issues.

14   Adjudication of the common issues in a single action has important and desirable advantages

15   of judicial economy.

16        86.    There are questions of law and fact common to the Class which predominate

17   over any individual questions. These common questions include, but are not limited to:

18        (a)    Whether Adobe's Adobe Experience Platform in fact enabled Adobe

19   to compile extensively detailed profiles of Class members;

20        (b)    Whether Adobe's practices prevented Class members from opting out

21   of data collection by Adobe;

22        (c)    Whether Adobe violated Class members' right to privacy under the

23   California Constitution;

24        (d)    Whether Adobe intruded upon the seclusion of Class members;

25        (e)    Whether Adobe's collection and compilation of Class members'

26   information constituted a violation of the California Invasion of Privacy Act

27        (f)    Whether Adobe has been unjustly enriched to the detriment of Class

28   members;

1      (g)     Whether Class members are entitled to damages, restitution, equitable

2 relief, statutory damages, punitive damages, and/or other relief due to Adobe's conduct; and

3      (h)     Whether Class members are entitled to declaratory, injunctive, or

4 monetary relief due to Adobe's conduct, and, if so, in what amount and form.

5      87.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims

6 are typical of the other Class members' claims because Plaintiff's information, like that of

7 every Class member, was collected and compiled by Adobe through the Adobe Experience

8 Platform and Adobe's tracking technologies. Plaintiff and the other Class members suffered

9 damages as a direct proximate result of the same wrongful practices in which Adobe

10 engaged. Plaintiff's claims arise from the same practices and course of Conduct that give rise

11 to the other Class members' claims.

12      88.    **Adequacy of Representation – Federal Rule of Civil Procedure 23(a)(4)**.

13 Plaintiff is an adequate Class representative because his interests do not conflict with the

14 interests of the other Class members who he seeks to represent. Plaintiff has retained

15 competent counsel experienced in complex class action litigation, and Plaintiff intends to

16 prosecute this action vigorously. The Class members' interests will be fairly and adequately

17 protected by Plaintiff and his counsel.

18      89.    **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is

19 superior to any other available means for the fair and efficient adjudication of this

20 controversy and no unusual difficulties are likely to be encountered in the management of

21 this class action. The damages or other financial detriment suffered by Plaintiff and the other

22 Class members are relatively small compared to the burden and expense that would be

23 required to individually litigate their claims against Adobe, so it would be impracticable for

24 the members of the Class to individually seek redress of Adobe's wrongful conduct. The

25 prosecution of separate actions by individual Class members would create a risk of

26 inconsistent or varying adjudications with respect to individual Class members, which would

27 establish incompatible standards of conduct for Adobe, particularly with regard to how

28 Adobe is permitted to collect and warehouse consumer data going forward. In contrast, the

1   conduct of this action as a class action presents far fewer management difficulties, conserves

2   judicial resources and the parties' resources, and protects the rights of each Class member.

3       90.   **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure**

4   **23(b)(2).** Adobe acted or refused to act intentionally and uniformly with regard to Plaintiff

5   and all other Class members, and are continuing to do so, thereby making declaratory relief

6   appropriate with respect to the Class as a whole. Plaintiff also seeks to represent the Class

7   under Rule 23(b)(2) to obtain final injunctive relief forcing Adobe to cease its nonconsensual

8   collection and warehousing of consumer information, including, among other things, forcing

9   it to cease its practice of passing its third-party cookies off as first-party cookies to

10  circumvent cookie blocking technology.

11      91.   **Issue Certification – Federal Rule of Civil Procedure 23(c)(4).** As an

12  alternative to Rule 23(b)(2) and/or 23(b)(3), Plaintiff seeks issue certification under Rule

13  23(c)(4) of liability issues common to all Class members.

14  **VII.   CAUSES OF ACTION**

15              <u>**FIRST CAUSE OF ACTION**</u>
            **Invasion of Privacy Under the California Constitution**
16          **(On Behalf Of Plaintiff And the California Class)**

17      92.   Plaintiff repeats and realleges all preceding paragraphs contained herein.

18      93.   Article I, Section 1 of the California Constitution provides: "All people are

19  by nature free and independent and have inalienable rights. Among these are enjoying and

20  defending life and liberty, acquiring possessing, and protecting property and pursuing and

21  obtaining safety, happiness, *and privacy*." (emphasis added).

22      94.   Notably, the inalienable right to privacy was added to the California

23  Constitution pursuant to a constitutional amendment that was specifically concerned with the

24  risks inherent in computerized records, which, it was argued, could "make[] it possible to

25

26

27

28

1    create 'cradle-to-grave' profiles of every American."[40] Such profiles can be leveraged for

2    unwanted and even nefarious purposes.

3         95.    These profiles are fundamentally invasive and, when coupled with real-time

4    tracking technology, effectively allow the highest bidder to relentlessly surveil millions of

5    people who did not consent to such surveillance. It is a fact that in the digital age it is a virtual

6    necessity for people to live a significant portion of their lives online, whether it's to maintain

7    a bank account, make appointments with doctors, or to keep an email account to

8    communicate with employers and other important people and institutions. It is not reasonable

9    to ask people to opt out of using the internet because, at bottom, that is asking them to opt

10   out of modern society.

11        96.    Instead, the reasonable course is to acknowledge the fundamental fact that so

12   much of life is conducted online and that, because amount of information gathering that can

13   be done online that was unthinkable mere decades ago, the right to privacy should not

14   disappear simply because a person is in a digital space and not a physical one. A person has

15   as much of a right to not be stalked online as they do when they are walking on the street.

16   This is the principle enshrined in the California Constitution, and where it is violated by

17   companies like Adobe it is crucial that the State is able to impose meaningful restraints on

18   their violative behavior.

19        97.    Adobe, in violation of Plaintiff and the Class members' reasonable

20   expectation of privacy, has followed them across the internet and meticulously intercepted,

21   collected, and compiled their information for the benefit of Adobe's corporate clients. The

22   scope of Adobe's surveillance – which, due to the ubiquity of Adobe's tracking technology

23   across the most popular websites and mobile applications, is inescapable – and construction

24   of profiles of individuals – which can consist of over 100,000 data points *per person* – far

25   exceeds the reasonable expectation of consumers.

26

27   ---

     [40] Ballot Pamp., *Proposed Stats. & Amends. To Cal. Const. With Arguments to Voters. Gen.
28   Election* *26 (Nov. 7, 1972).

98. Adobe benefits when it allows individuals to be misled about how much of their information is being collected by third-parties. Consumers, even when they grant permission for certain companies that they do business with to collect fragmentary pieces of data, do not have visibility into how that data is subsequently being compiled. A consumer may reasonably believe that when they make an account on a company's website, the company is only collecting the fragmentary information that the consumer is directly giving to the company, such as their email address and their first name. What they do not realize is that the same company, by using the surveillance suite made available to them by Adobe, can now merge that information with their own data regarding those customer's offline habits, along with a massive repository of other data collected directly by Adobe through its tracking cookies and third-party data purchased through Adobe's Audience Marketplace. Consequently, that company that the consumer thought only had their email address and first name is able to wed that information to far more sensitive (and, to the company, valuable) information, such as their sexual orientation, whether they've visited a website for a particular medication, and thousands of other traits that consumers do not know have been collected and compiled.

99. This information is "personal information" under California law, which defines personal information specifically to include "[i]nternet or other electronic network activity information," such as "browsing history, search history, and information regarding a consumer's interaction with an internet website, application, or advertisement." Cal. Civ. Code § 1798.140.

100. All of this descends from Adobe's desire for the AEP to provide one-stop shopping for companies that want to know everything about not only their own customers, but also millions of other people with whom they have no relationship and who might not even know they exist.

101. The consumer would also reasonably expect that the privacy policy listed on a company's website corresponds with that company's actual data use practices, but if the company is using Adobe's surveillance suite it may not have affirmative toggled the features

that stop Adobe from absorbing certain information consistent with the corporate client's privacy policy. However, because Adobe permits all collection by default and does not appear to audit its corporate clients to ensure that their use of its platform is consistent with their stated privacy policies, Adobe is facilitating the improper collection of consumer data in contravention of the consumer facing privacy policies that provide the foundation for consumers to make decisions about whether they are comfortable bringing their business to a given company.

102.    Worse still, not only does a company that consumer has directly done business receive an incredibly detailed, near-real time portrait of the consumer, the cookies employed by Adobe are frequently syncing with the cookies of other internet companies, ensuring that the consumer's information is also shared with countless other entities.

103.    Adobe also takes deliberate, affirmative steps to conceal and perpetuate its surveillance by purposefully using domain names, such as demdex, that aren't readily connected to Adobe and by creating workarounds that allow its third-party cookies to pass themselves off as first-party cookies, thus circumventing attempts by privacy-conscious consumers to protect their data.

104.    Plaintiff and the Class members have virtually no recourse against Adobe for this egregious behavior. If a consumer can even identify Adobe as the entity collecting and housing their data – a non-trivial task, as they might not be aware of the corporate client that has purchased their information, much less that the corporate client has a relationship with Adobe – attempts by the consumer to prevent further data collection and compilation are complicated and frequently thwarted. As evidence has shown, Adobe's cookies can circumvent cookie-blocking technologies, opting out of tracking through a cookie pop-up does nothing about the demdex cookie because it has already attached to the consumer's browser by the time the pop-up appears, and attempts to opt out of collection on Adobe's website may not actually prevent that collection.

105.    For the foregoing reasons, Adobe's practices violate Plaintiff and the Class members' reasonable expectation of privacy and are highly offensive to a reasonable person.

106.     The right to privacy in California's Constitution creates a right of action for California residents against private entities such as Adobe when they violate a California resident's right to privacy.

107.     Plaintiff and the Class members have been damaged by Adobe's invasion of their privacy by having their rights violated, and they are therefore entitled to just compensation and injunctive relief.

## SECOND CAUSE OF ACTION
### Intrusion Upon Seclusion
### (On Behalf Of Plaintiff And the Nationwide Class)

108.     Plaintiff repeats and realleges all preceding paragraphs contained herein.

109.     Plaintiff alleges intrusion upon seclusion under California law on behalf of the Class.

110.     To allege intrusion upon seclusion, Plaintiff must show intrusion (a) into a private place, conversation, or matter and (b) in a manner highly offensive to a reasonable person. Both of these factors are plainly present here.

111.     In the twenty-first century, so much of people's daily lives are conducted online, including essential functions like banking. Many interactions online, particularly with businesses, require the disclosure of sensitive information that people would not openly share with the average person on the street. This includes information that can be used to compromise a person's identity (such as their full name, email address, or phone number) and information suggestive of their personality (behavioral and preference data like which videos they stop to watch on a webpage or what their religious affiliation is). Such information is "personal information" under California law, which includes "browsing history, search history, and information regarding a consumer's interaction with an internet website. Cal. Civ. Code § 1798.140.

112.     Much like a person disclosing their account information with a bank teller, consumers providing personal information on the internet in these interactions are engaging in a private exchange or matter, even if it is in a quasi-public setting, and have a reasonable right to privacy in those interactions.

113.    Adobe actively intercepts the web-browsing data of consumers through its tracking technology and then warehouses it in a massive database, all for the benefit of its corporate clients. Upon information and belief, Plaintiff and the Class members had their information intercepted and warehoused in this manner.

114.    Consumers, who are simply trying to go about their daily lives on the internet, do not realize the scale of this collection, if they are aware of the collection at all. They do not realize that they are being followed across the internet, with Adobe tracking where they go and, often, what they do. They do not realize that every seemingly-innocuous click on a webpage may be collected by Adobe, further contributing to the depth and accuracy of the profile that Adobe has built on them.

115.    What is more, Adobe enables its corporate clients to wed online profiles with offline profiles of its customers, tracking real-world offline activities and intruding upon the individual in a place where they did not believe they were being watched. To the extent that a person seeks to maintain a separate online and offline existence and enjoy the same level of anonymity that they would have walking down a city street, such a wish is now impossible thanks to Adobe's spying.

116.    It is highly offensive to a reasonable person that the most cursory interaction with a website can lead to a third-party – Adobe in the first instance and any third-parties it syncs its cookies with in the second – with whom the individual has no relationship whatsoever, knowing the most intimate details of their lives. It is, further, highly offensive that Adobe is able to do this to consumers even when those consumers have taken affirmative steps to preserve their privacy by attempting to opt out of Adobe's tracking through the use of third-party cookie blockers or by opting out of tracking through Adobe's website.

117.    It is highly offensive to a reasonable person that Adobe maintains and continually builds profiles about consumers on a near-real time basis, effectively allowing Adobe to follow them across virtual space.

118.    It is highly offensive to a reasonable person that Adobe does all of this for the sake of its own profits and does not impose meaningful safeguards to ensure that its corporate

1    clients do not abuse Adobe's surveillance tools to capture data in contravention of the

2    corporate client's privacy policies.

3        119.    Adobe's practices as alleged herein violate Plaintiff and the Class members'

4    reasonable expectations of privacy and are highly offensive to a reasonable person. They are

5    entitled to recompence from Adobe and Adobe should be enjoined from engaging in this

6    offensive behavior.

7        120.    Plaintiff seeks nominal and punitive damages in an amount to be determined

8    at trial. Punitive damages are warranted because Adobe's conduct is egregious and clearly

9    calculated to injure Plaintiff and the Class members in conscious disregard of their right to

10    privacy.

11        121.    Plaintiff seeks restitution because Adobe was unjustly enriched by collecting,

12    packaging, and selling their personal data to their corporate clients and to third-parties

13    through the use of cookie syncing technology.

14        122.    Plaintiff seeks injunctive relief, including relief that would forbid Adobe (a)

15    from disguising its third-party cookies as first-party cookies to circumvent cookie blocking

16    software, (b) from attaching its cookies to consumers' web browsers within milliseconds of

17    logging on to a website hosting the cookies, which renders cookie opt out pop ups ineffectual,

18    (c) from combining data collected by corporate clients relating to individuals' real world

19    activity with digital data on Adobe's AEP, and (d) from amassing profiles on individuals

20    including tens of thousands of data points. Plaintiff also seeks injunctive relief requiring

21    Adobe to delete all data that it has obtained in violation of Plaintiff and the Class members'

22    rights.

23                    **THIRD CAUSE OF ACTION**

24        **Violation of the California Invasion of Privacy Act ("CIPA")**
         **Cal. Penal Code § 631(a)**
25        **(On Behalf Of Plaintiff And the California Class)**

26        123.    Plaintiff repeats and reallege all preceding paragraphs contained herein.

27

28

124.    The California Invasion of Privacy Act ("CIPA") imposes penalties for eavesdropping on private electronic communications. *See* Cal. Penal Code § 631(a). In relevant part, CIPA forbids an individual or entity from (a) using a "any machine, instrument or contrivance" to (b) "willfully and without consent of all parties to the communication…read[], or attempt[] to read, or to learn the contents or meaning of" (c) "any message, report, or communication while" (d) "the same is in transit or passing over any wire, line, or cable." *Id*. It also prohibits the "use, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained." *Id*. Adobe has therefore clearly violated CIPA.

125.    The "machine, instrument of contrivance" used by Adobe is its full surveillance suite, the AEP, including all underlying computer codes, tracking devices, and computing and mobile devices used to effectuate the collection of Plaintiff and the Class members' communications.

126.    The cookies that Adobe places on web browsers and in mobile applications are the chief mechanism that Adobe uses to intercept consumer communications over the internet, which constitutes a "wire, line, or cable."

127.    These communications are in the form of information shared by consumers with the websites they are using, including information they communicate through written inputs, such as their name and email address, and through non-written behavioral inputs that convey the consumer's intent, such as whether they click on a particular link.

128.    All of this is done without the consent of the consumer. This collection is often occurring totally unbeknownst to the user, and users have no reason to suspect that Adobe is collecting their information when they visit, for example, Coca-Cola.com, because even if they consult the list of cookies on the webpage they will not see any cookies with host domains suggesting Adobe's presence, particularly when some of those cookies are listed as first-party cookies and the consumer has no reason to think Adobe would be a first-party on a website managed by Coca-Cola. Consumers cannot consent to the interception of their communications by a third-party, Adobe, that they *do not even know* is present.

129.    Even if consumer is aware of the existence of Adobe's cookies, moreover, they are not given the opportunity to meaningfully consent to their presence and on-going collection of the consumer's data, because (a) refusing consent through the consent popup does not actually prevent Adobe's cookies from gathering information, (b) attempts to block the cookies through third-party cookie blockers may be ineffective, as Adobe offers its corporate clients the ability to disguise Adobe's third-party cookies and first-party cookies, and (c) opting out through Adobe's website is a convoluted process that, at best, requires the user to both know that Adobe is collecting their information and keep cookies enabled, and, at worst, is ineffectual at actually stopping Adobe's tracking.

130.    Adobe's tracking devices send these ill-gotten communications back to Adobe, where it stores the information on its data platforms. It is then through the DMP and CDP, sometimes using additional data from the Audience Marketplace, that Adobe reads and analyzes the raw information that it has collected and compiled so that it can build profile for current and prospective customers for its corporate clients.

131.    To be clear, Adobe would be in violation of CIPA even if all it did was collect this information. It goes a step further by "communicating" the information to corporate clients through its various analytics offerings, including the ID Graph, that incorporate the information, and by synchronizing its cookies with other third-party cookies on the web.

132.    Upon information and belief. Plaintiff and the Class members' communications were improperly intercepted by Adobe without their consent and were accessed, read, and analyzed by Adobe, and were subsequently made available to Adobe's corporate clients.

133.    Plaintiff and the Class members have suffered loss by reason of these violations, including, but not limited to, violation of their rights to privacy and loss of value in their personally identifiable information.

134.    Pursuant to California Penal Code § 637.2, Plaintiff and the Class members have been injured by the violations of California Penal Code § 631, and each of Plaintiff and

1    the Class members seek damages for the greater of $5,000 or three times the amount of actual

2    damages, as well as injunctive relief.

### FOURTH CAUSE OF ACTION
**Unjust Enrichment (Quasi-Contract)**
**(On Behalf Of Plaintiff And the Nationwide Class)**

5    135.    Plaintiff repeats and realleges all preceding paragraphs contained herein.

6    136.    Plaintiff alleges that Adobe has unjustly enriched itself by directly collecting

7    his data when he was unaware of the collection and when he expressly attempted to opt out

8    of such collection, compiling that data into highly-detailed profiles, and selling those profiles

9    through its AEP and data through cookie syncing.

10    137.    Plaintiff alleges that Adobe further unjustly enriches itself by selling the AEP

11    as a service to its corporate clients, which is fundamentally a surveillance tool that enables

12    corporate clients to spy on individuals on an otherwise unattainable scale.

13    138.    It would be inequitable and unjust for Adobe to be permitted to retain any of

14    the unlawful proceeds resulting from its egregious and unlawful conduct.

15    139.    Plaintiff and the Class members accordingly are entitled to equitable relief,

16    including restitution and disgorgement of all revenues, earnings, and profits that Adobe

17    obtained as a result of its egregious and unlawful conduct. To do so, Plaintiff and the Class

18    members do not need to demonstrate that they suffered a loss, as a plaintiff is entitled to

19    recovery under California common law so long as the defendant unjustly enriched itself in

20    connection with violating a plaintiff's legally-protected right.[41] As alleged herein, Adobe

21    profited from the violation of Plaintiff and the Class members' right to privacy.[42]

---

[41] *See, e.g.,* Rest. (Third) of Restitution, § 1, cmt. e. (Where a plaintiff has not suffered a loss following the conferral of a benefit to defendant, but the resulting enrichment is nonetheless unjust, "[t]he defendant may be under a duty to give the plaintiff the amount by which [the defendant] has been enriched.").

[42] *See, e.g.,* Rest., Restitution § 1, cmt. a. ("[T]he consecrated formula 'at the expense of another' can also mean 'in violation of the other's legally protected rights,' without the need to show that the claimant has suffered a loss.").

140.    The elements for a claim of unjust enrichment are (a) receipt of a benefit and (b) unjust retention of the benefit at the expense of another.

141.    Here, Adobe collected massive amounts of data about Plaintiff and the Class members without the consent of those individuals, in blatant contravention of their right to privacy and in violation of California law. Adobe was then able to sell that data through cookie syncing and the AEP, conferring upon it substantial financial benefit that can and will be discerned through the discovery process.

142.    The appropriate remedy for this unjust enrichment is disgorgement of the profits that Adobe has made from disclosing myriad sensitive information about Plaintiff. California law recognizes the right to such disgorgement even where an individual has not suffered a corresponding loss, because disgorgement helps remediate the rights violation imposed upon a plaintiff and acts as a substantial deterrent to a defendant's abhorrent behavior.

**FIFTH CAUSE OF ACTION**
**Statutory Larceny**
**California Penal Code §§ 484 and 496**
**(On Behalf Of Plaintiff And the California Class)**

143.    Plaintiff repeats and realleges all preceding paragraphs contained herein.

144.    Plaintiff incorporates all preceding paragraphs as though set forth herein.

145.    Section 496(a) prohibits the obtaining of property "in any manner constituting theft."

146.    Section 484 defines theft, and provides:

> Every person who shall feloniously steal, take, carry, lead, or driveaway the personal property of  another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft.

147.    Section 484 thus defines "theft" to include obtaining property by false pretense.

148.    Defendant intentionally designed a program that would operate in a manner unbeknownst to Plaintiff whose computers were thus deceived into providing valuable data to Defendant.

149.    Defendant acted in a manner constituting theft and/or false pretense.

150.    Defendant stole, took, and/or fraudulently appropriated Plaintiff's valuable data without Plaintiff's consent.

151.    Defendant concealed, aided in the concealing, sold, and/or utilized Plaintiff's valuable data that was obtained by Defendant for Defendant's commercial purposes and the financial benefit of Defendant.

152.    Defendant knew that Plaintiff's valuable data was stolen and/or obtained because Defendant designed the code that tracked Plaintiff's web browsing and operated it in a manner that was concealed and/or withheld from Plaintiff.

153.    The reasonable and fair market value of the unlawfully obtain personal data can be determined in the marketplace.

### SIXTH CAUSE OF ACTION
**Violation of the California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code § 17200,** *et seq.*
**(On Behalf Of Plaintiff And the California Class)**

154.    Plaintiff incorporates all preceding paragraphs as though set forth herein.

155.    The UCL prohibits any "unlawful, unfair, or fraudulent business act or practice and unfair, deceptive, untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17200.

156.    Adobe is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

157.    Adobe violated Cal. Bus. & Prof. Code §§ 17200, et seq. ("UCL") by engaging in unlawful and unfair business acts and practices.

158.    Adobe's "unlawful" acts and practices include its violation of the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq.; California Statutory Larceny, Cal. Penal Code §§ 484 and 496; and the Common Law Right of Privacy.

159.    Adobe's conduct violated the spirit and letter of these laws, which protect property, economic and privacy interests and prohibit unauthorized disclosure and collection of private communications and personal information.

160.    Adobe's "unfair" acts and practices include its violation of property, economic and privacy interests protected by the California Invasion of Privacy Act, Cal. Penal Code §§ 630, et seq.; California Statutory Larceny, Cal. Penal Code §§ 484 and 496; and the Common Law Right of Privacy. To establish liability under the unfair prong, Plaintiff need not establish that these statutes were actually violated, although the claims pleaded herein do so.

161.    Plaintiff had no reason to know and could not have anticipated Adobe's intrusion into his privacy by the unlawful and unfair collection of his personal information.

162.    Adobe's conduct was immoral, unethical, oppressive, unscrupulous and substantially injurious to Plaintiff. Further, Adobe's conduct narrowly benefitted its own business interests at the expense of Plaintiff's fundamental privacy interests protected by the California Constitution and the common law.

163.    Plaintiff has suffered in jury-in-fact, including the loss of money and/or property as a result of Adobe's unfair and/or unlawful practices, to wit, the unauthorized disclosure and taking of his personal information which has economic value.

164.    Plaintiff has suffered harm in the form of diminution of the value of his private and personally identifiable data and content.

165.    Adobe's caused damage to and loss of Plaintiff's property right to control the dissemination and use of his personal information and communications.

166.    Adobe has also reaped unjust profits and revenues in violation of the UCL. This includes Adobe's profits and revenues from its targeted-advertising and sales of its other

1   services to its customers. Plaintiff seeks restitution and disgorgement of these unjust profits

2   and revenues.

3       167.    Plaintiff seeks all monetary and non-monetary relief allowed under the statute

4   and equity, including restitution; declaratory relief; reasonable attorneys' fees and costs

5   under California Code of Civil Procedure § 1021.5; injunctive relief; and other appropriate

6   equitable relief permissible under the UCL.

7                          **SEVENTH CAUSE OF ACTION**
                              **Declaratory Judgement**
8                **(On Behalf Of Plaintiff And the Nationwide Class)**

9       168.    Plaintiff repeats and realleges all preceding paragraphs contained herein.

10      169.    Adobe has repeatedly and brazenly collected, tracked, analyzed, and

11  exploited the personal information of Plaintiff and Class members, who did not consent to

12  such collection, tracking, analysis, and exploitation. Adobe has done so through a massive

13  spying program, the AEP, that allows it to reach and monitor virtually every internet user in

14  the United States.

15      170.    Adobe has accomplished this in part through a campaign of deliberately

16  obfuscating its role in the collection of consumer's personal information. Its tracking cookies

17  do not bear indications that they originate from Adobe. This makes it exceedingly difficult

18  for consumers to know that they have had their personal information taken by Adobe.

19      171.    Adobe has also built sophisticated tools that allow it to circumvent user

20  attempts to avoid having their data collected by Adobe. Technologies to block third-party

21  tracking cookies are evaded when Adobe's cookies are able to disguise themselves as first-

22  party cookies, cookie opt outs that appear on web pages are ineffectual, and opting out

23  through Adobe itself is convoluted and, evidence suggests, ineffectual.

24      172.    Adobe benefits from the asymmetrical field of information available to it and

25  its corporate clients verses the information available to the consumers simply trying to use

26  the internet in their day-to-day lives. These consumers often do not know Adobe is tracking

27  them, and, if they find out and try to get it to stop, they have no way of knowing whether

28  Adobe has stopped and what information Adobe has already collected and shared about them.

1  Adobe further exploits this asymmetrical field of information by improperly relying upon
2  Adobe's corporate clients to only use the AEP to collect information consistent with those
3  corporate clients' privacy policies, often a consumer's only indication of how their
4  information is being collected and used, and not monitoring their use for consistency with
5  those policies. By maintaining its ignorance, it abets the deception of consumers by their
6  corporate clients.

7      173.    Using its massive data collection apparatus and database infrastructure,
8  Adobe is able to combine the data it has collected in its database with other data, including
9  data purchased by data brokers, to create exceptionally detailed near-real time portraits of
10 consumers, which it then turns around and sells to corporate clients who either already have
11 those consumers as customers or who want those consumers as customers. Adobe also shares
12 this data with additional third-parties, beyond its corporate clients, through the cookie
13 syncing undertaken by some of its tracking cookies.

14     174.    Adobe's misconduct cannot be understated; it has placed Plaintiff and the
15 Class members' privacy and autonomy at risk, violated their dignitary rights and right to
16 privacy, and undermined the economic value of their personal data by freely packaging and
17 sharing their personal information.

18     175.    Accordingly, Plaintiff seeks appropriate declaratory relief in the form of a
19 declaratory judgment in favor of Plaintiff and the Class members against Adobe pursuant to
20 28 U.S.C. § 2201, declaring that Adobe's conduct is unlawful as alleged herein.

21 **VIII.   PRAYER FOR RELIEF**

22     WHEREFORE, Plaintiffs respectfully request that this Court:

23     A.    Certify this action is a class action pursuant to Rule 23 of the Federal Rules
24           of Civil Procedure;

25     B.    Award compensatory and punitive damages, including statutory damages
26           where available, to Plaintiff and the Class against Defendant for all damages
27           sustained as a result of Defendant's wrongdoing, in an amount to be proven
28           at trial, including interest thereon;

C.   Permanently restrain Defendant, and its officers, agents, servants, employees and attorneys, from the unlawful acts described herein;

D.   Award Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.   Grant Plaintiff such further legal and equitable relief as the Court deems appropriate.

## IX.   JURY TRIAL DEMAND

The Plaintiff demands a trial by jury of all issues so triable.

DATED:  MAY 5, 2025

 /s/ Brian O. O'Mara
Brian O. O'Mara (Cal. Bar No. 229737)

**DICELLO LEVITT LLP**
4747 Executive Dr. Suite 240
San Diego, CA 92121
Telephone: (619) 923-3939
briano@dicellolevitt.com

Daniel R. Schwartz (pro hac vice pending)
Rebecca Trickey (pro hac vice pending)
**DICELLO LEVITT LLP**
Ten North Dearborn Street, Sixth Floor
Chicago, Illinois 60602
Telephone: (312) 214-7900
dschwartz@dicellolevitt.com
rtrickey@dicellolevitt.com

David A. Straite (pro hac vice pending)
**DICELLO LEVITT LLP**
485 Lexington Ave., Tenth Floor
New York, New York 10017
Telephone: (646) 933-1000
dstraite@dicellolevitt.com

Counsel for Plaintiff and the Putative Class and Subclass